1  ADAM H. FLEISCHER (Illinois Bar No. 6224928)
   (admitted *pro hac vice*)
2  JOHN A. HUSMANN (Illinois Bar No. 6273392)
   (admitted *pro hac vice*)
3  JOANNA G. SWARTOUT (Illinois Bar No. 6305993)
   (admitted *pro hac vice*)
4  BATESCAREY LLP
5  191 North Wacker, Suite 2400
   Chicago, Illinois 60606
6  Telephone: (312) 762-3100
   Facsimile:  (312) 762-3200
7  afleischer@batescarey.com
   jhusmann@batescarey.com
8  jswartout@batescarey.com
9  *Attorneys for Plaintiff,*
   *Rockhill Insurance Company*
10
11 DANIEL T. HAYWARD (SBN 5986)
   LAXALT & NOMURA, LTD.
12 9790 Gateway Drive, Suite 200
   Reno, Nevada  89521
13 Telephone:  (775) 322-1170
   Facsimile:   (775) 322-1865
14 dhayward@laxalt-nomura.com
15
16          **UNITED STATES DISTRICT COURT**
17             **DISTRICT OF NEVADA**
18 ROCKHILL INSURANCE COMPANY,

19            Plaintiff,                     Case No.: 3:17-cv-00496-HDM-WGC

20 v.                                        **ROCKHILL INSURANCE COMPANY'S**
                                             **MOTION FOR SUMMARY JUDGMENT**
21                                           **ON ROCKHILL'S  AMENDED**
   CSAA INSURANCE EXCHANGE D/B/A             **COMPLAINT**
22 AAA INSURANCE EXCHANGE;
   PREMIER RESTORATION AND
23 REMODEL, INC.
24
               Defendants.
25
26 PREMIER RESTORATION AND
   REMODEL, INC.
27
28

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

1              Counter-Claimant,

2    vs.

3    ROCKHILL INSURANCE COMPANY,

4              Counter-Defendant,

5

6    CSAA INSURANCE EXCHANGE D/B/A
     AAA INSURANCE EXCHANGE
7

8              Counter-Claimant,

9    vs.

10   ROCKHILL INSURANCE COMPANY,

11             Counter-Defendant,

12

13         NOW COMES Plaintiff/Counter-Defendant Rockhill Insurance Company ("Rockhill"),

14   by and through its attorneys, BatesCarey LLP and Laxalt & Nomura, Ltd., and files its Motion

15   For Summary Judgment and Memorandum in Support Thereof pursuant to Fed. R. Civ. Pro. 56

16   and LR 56-1, seeking judgment as a matter of law on Rockhill's Amended Complaint (ECF 14)

17   and the Defendants' associated Counterclaims (ECF 38, ECF 62).

18

19

20

21

22

23

24

25

26

27

28

LAXALT & NOMURA.
ATTORNEYS AT LAW
9790 GATEWAY
DRIVE
SUITE 200
RENO. NEVADA

## **TABLE OF CONTENTS**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................................... 1

II.  UNDISPUTED FACTS ................................................................................................. 2

    A.   The Rockhill Coverage ................................................................................. 2

    B.   The Underlying Claim by the Sakamotos ................................................... 3

    C.   The Underlying Lawsuit Filed by CSAA Against Premier .......................... 4

    D.   The Declaratory Judgment Complaint ....................................................... 7

    E.   CSAA's Lack of Investigation Regarding the Contractor's Pollution
        Coverage Limits ........................................................................................... 8

    F.   The Contractors Pollution Liability Coverage As Compared To The CGL
        Coverage ........................................................................................................ 9

III. LEGAL STANDARD .................................................................................................. 11

IV.  CHOICE OF LAW FAVORS NEVADA ..................................................................... 12

V.   COVERAGE APPLIES UNDER THE CONTRACTOR'S POLLUTION PART
    AND NOT THE CGL COVERAGE PART, WHICH EXCLUDES MOLD AND
    POLLUTION ................................................................................................................ 14

    A.   The Contractor's Pollution Liability Coverage Applies To This Claim ....... 14

    B.   The CGL Coverage Part Does Not Cover This Claim, *As This Court
        Previously Indicated* .................................................................................... 15

        1.   The Mold Exclusion Precludes CGL Coverage for Claims Arising from Work
            to Prevent the Growth of Mold. ................................................................... 16

        2.   The Pollution Exclusion Also Precludes Coverage For The Underlying Lawsuit
            Under the CGL Coverage Part ..................................................................... 19

VI.  EACH OF CSAA'S BAD FAITH THEORIES CAN BE DECIDED AS A
    MATTER OF LAW TO FIND THAT ROCKHILL IS NOT LIABLE FOR
    COMMON LAW BAD FAITH ................................................................................... 20

    A.   Rockhill's Decision to Deny Coverage Under the CGL Coverage is a Pure Legal
        Question and Does Not Create Bad Faith ................................................... 21

    B.   Bad Faith Failure to Settle Can Be Determined As a Matter of Law ........... 22

    C.   As a Matter of Law, Disagreements Over Liability Do Not Create Bad Faith ... 24

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

1

VII. CONCLUSION ........................................................................................................ 28

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LAXALT & NOMURA.
ATTORNEYS AT LAW
9790 GATEWAY
DRIVE
SUITE 200
RENO. NEVADA

# I.   <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

After a home flooded as a result of a broken pipe, the homeowners' insurer, CSAA Insurance Exchange ("CSAA"), promised to "guarantee satisfaction" if the homeowners used a vendor in CSAA's preferred network for remediation and mold prevention.  (Ex. 1, April 26, 2016 Status Report, Pg. 2, Rockhill001698.)   When the homeowners later alleged that they smelled an odor from the mold prevention chemicals, they complained that they were not satisfied with the remediation efforts that CSAA had promised.  (ECF 61 at ¶ 4.)  Even after the odor levels in the home were reduced to amounts below the level known to be detectable by the human nose, the homeowners still demanded satisfaction. (Ex. 2, Environmental Testing & Consulting Report, Pg. 6, Rockhill001347-76.)   In response, CSAA demolished the existing home and built a new, larger home at the cost of approximately $3 million.  (ECF 61 ¶ 4.)  CSAA then sued to recover its payments from the company in its preferred network that performed the mold remediation work, Premier Restoration & Remodel ("Premier").

Premier's insurer, Rockhill Insurance Company ("Rockhill"), defended Premier against the unusual claim under a Contractor's Pollution Liability policy specifically written to cover claims arising from mold prevention work.  (Ex. 3, June 2, 2015 ROR, Pg. 1, Rockhill001526-27.)  When defense counsel completed discovery and analysis of all issues, he advised Rockhill for the first time that the claim could have a settlement value of $600,000-$800,000.  (Ex. 4, Oct. 10, 2016 Pre-Trial Report, Pg. 13, Rockhill002331.)  Rockhill then offered to settle for the entire $700,000 limits remaining on the policy.  (Ex. 5, Nov. 8, 2016 FARA Claims Notes, Rockhill002247) CSAA refused that offer.  (*Id*.)  After trial then ensued, CSAA was awarded $2.3 million by a trial judge, which it now seeks to collect against Rockhill—despite the fact that the limits remaining at the time of the judgment were well below the $700,000 in eroding limits offered before the trial.  (ECF 61 at ¶ 7.)

This motion seeks summary disposition in favor of Rockhill premised upon the following points of law and fact: 1) the coverage part applicable to claims arising from mold

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

1

prevention activities is the Contractor's Pollution Liability Coverage Part and not the Commercial General Liability ("CGL") Coverage Part, which specifically excludes claims arising from mold prevention activities; 2) CSAA never inquired of the remaining limits of Rockhill's Contractor's Pollution Liability Coverage Part, nor made a demand within the remaining limits of the Contractor's Pollution Liability Coverage Part; 3) Rockhill reasonably relied on the advice of its competent counsel to value the case and formulate settlement strategy; and 4) upon the completion of discovery and advice of counsel, Rockhill properly tendered its remaining limit to CSAA.

Rockhill requests that the Court grant judgment finding that the Contractor's Pollution Liability Coverage Part of the policy applies to CSAA's claim, the remaining limits of which have already been paid by Rockhill to CSAA.  Rockhill also requests that the Court grant judgment in its favor, finding that the Mold Exclusion applies to preclude coverage under the CGL Coverage Part.  (ECF 14 Count II.)  Finally, Rockhill requests a ruling in its favor that, because Rockhill has properly paid the applicable limit under its policy, Rockhill did not breach the covenant of good faith and fair dealing, and is not responsible for paying the full amount of CSAA's judgment against Premier. (ECF 62, 38.)

## II.   **UNDISPUTED FACTS**

### A.   **The Rockhill Coverage**

On January 30, 2008, Premier entered into a Direct Repair Network Agreement (the "Vendor Agreement") with CSAA as one of its preferred vendors for mold prevention services. (ECF 14-4.)  The Vendor Agreement stated that "Vendor will provide certificates of insurance and additional insured endorsements evidencing the following coverages and minimum limits." (ECF 14-4 at ¶ 3.3.)  The first of the two coverages required by CSAA's Vendor Agreement was CGL insurance with limits of not less than $1 million.  (ECF 14-4 at ¶ 3.3(b).)  CSAA required Premier's CGL policy to have defense costs paid in addition to the policy limits.  (ECF 14-4 at ¶ 3.3.)

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

2

In addition to the CGL coverage, CSAA's Vendor Agreement stated that, if Vendor is (a) a restoration company or (b) a general contractor who performs mold remediation work, then Vendor must maintain the following additional insurance coverages: pollution liability insurance…including coverage for mold without any mold exclusion." (ECF 14-4 at ¶ 3.3(c).) The Vendor Agreement did not require that the mold coverage had to have defense costs outside of limits. (ECF 14-4.)

Premier obtained a package policy from Rockhill that included CGL coverage with defense costs outside of limits and separate Contractor's Pollution Liability coverage with defense costs eroding the limits. (ECF 14-1.)

## B.   The Underlying Claim by the Sakamotos

CSAA provided a homeowners insurance policy (the "CSAA Policy") to James and Danielle Sakamoto (the "Sakamotos") for their vacation home in Lake Tahoe, California. (ECF 61 at ¶ 2.) The CSAA Policy contained a "guarantee satisfaction" provision, which stated that, if the Sakamotos used one of CSAA's preferred vendors, CSAA would "cause the damaged property to be restored to no less than its condition prior to the loss and repaired…at no additional cost." (Ex. 6, July 25, 2016 Post-Mediation Report, Ex. B Pg. 3, Rockhill002538.)

In January 2013, a pipe burst causing a water leak at the home. (ECF 61 at ¶ 23.) As a member of the preferred vendor network, Premier was retained to remediate the water damage and prevent mold growth at the Sakamotos' house. (Ex. 7, CSAA's Answer to Rockhill's First Set of Requests for Admission, Pg. 4, No. 7.)

Premier treated the home with an anti-fungal agent known as Sporicidin to stop the growth and spread of mold. (ECF 61 at ¶ 3.) Sporicidin contains phenol as its active ingredient. (ECF 64 at Exh. 1.) Premier allegedly over-applied the Sporicidin, causing the property to "emit a foul odor." (ECF 61 at ¶ 25.) The Sakamotos complained to CSAA of the odor even though the amount of phenol measured in the home in May 2013 was at a level below what is known to be detectable to the human nose. (Ex. 2, Environmental Testing & Consulting Report,

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

3

Pg. 6, Rockhill001347-76.)  Premier's principal, Timothy Jeter, also inspected the home after the owners complained, and could not smell the phenol.  (Ex. 8, Depo. of T. Jeter, 20:4-5.)

The Sakamotos insisted that the odor was perceptible, and demanded that CSAA pay for the home to be demolished and rebuilt.  (ECF 61 at ¶ 4.)  CSAA agreed to pay to demolish and rebuild a new, larger home for the Sakamotos at the cost of approximately $3 million.  (ECF 61 at ¶ 26.)  CSAA then pursued Premier to recover the cost of CSAA's "guarantee satisfaction" promise.

### C.     The Underlying Lawsuit Filed by CSAA Against Premier

On May 20, 2013, CSAA sent a Notice of a Potential Claim to Premier in relation to Premier's work at the Sakamotos' house.  (Ex. 9, May 20, 2013 Notice, Rockhill001379-81.) Premier tendered its defense to Rockhill.   (Ex. 10, May 9, 2013 FARA Claims Notes, Rockhill002039.)  On May 23, 2013, Rockhill sent a letter to Premier, reserving its rights and requesting additional information from Premier.  (Ex. 11, May 23, 2013 ROR, Rockhill001522-1523.)  On June 2, 2015, Rockhill sent a letter to Premier, informing the insured that <u>Rockhill was defending it on a pre-litigation basis under the Contractor's Pollution Liability Coverage Part, where the limits are reduced by claims expenses</u>.   (Ex. 3, June 2, 2015 ROR, Rockhill001526-1527.)  The letter also advised Premier that a judgment in the case could be excess of limits, and Premier has a right to retain its own counsel.  (*Id*.)

On June 23, 2015, CSAA filed a subrogation lawsuit against Premier, captioned *CSAA Insurance Exchange v. Premier Restoration & Remodel Inc.*, Case No. CGC-15-546518 in the Superior Court of the State of California, County of San Francisco (the "Underlying Lawsuit"). (ECF 14.)  On August 14, 2015, <u>Rockhill informed Premier that it was defending Premier against the subrogation action under the Contractor's Pollution Coverage Part</u>, subject to a reservation of rights.  (Ex. 12, August 14, 2015 ROR, Rockhill001528-38.)

On April 4, 2016, CSAA made a settlement demand of $999,999 under California Code of Civil Procedure Sec. 998.  (Ex. 13, April 4, 2016 CSAA 998 Offer, Pg. 1, Rockhill000791-

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

4

94.)  At the time, the remaining limits under the Contractor's Pollution Liability Coverage Part were necessarily less than $999,999, as the full limit of the coverage part was $1,000,000, and Rockhill had been defending Premier for approximately ten months.  (ECF 61 at ¶ 6.)  Premier's defense counsel formulated an initial analysis of the case and concluded that a reasonable repair of the house would involve replacing drywall and finishes, at an estimated cost of $100,000. (Ex. 4, Oct. 10, 2016 Pre-Trial Report, Pg. 12, Rockhill002330.)  On April 26, 2016, defense counsel sent a status report to Rockhill, recommending that Rockhill not accept CSAA's Offer to Compromise.  (Ex. 1, April 26, 2016 Status Report, Pgs. 7-8, Rockhill001697-1716.)  Premier was copied on the status report.  (*Id*., at 9.)

On May 3, 2016, defense counsel recommended that Rockhill issue a $40,000 response offer to CSAA's Offer to Compromise.   (Ex. 14, May 3, 2016 FARA Claims Notes, Rockhill001885.)  On May 9, 2016, Rockhill made a California Code of Civil Procedure Sec. 998 Offer to Compromise for $101,000, which CSAA rejected.  (Ex. 15, May 9, 2016 Premier 998 Offer, Rockhill000781-85.)

On June 7, 2016, defense counsel sent a Status Report to Rockhill, stating that Premier likely did not breach its duty while it was performing work at the Sakamotos' house.  (Ex. 16, June 7, 2016 Status Report, Pgs. 13-14, Rockhill001678-92.)  However, on June 23, 2016, based on developments in the case, Rockhill's defense counsel revised his valuation of the case to $371,000, with Premier's share being $278,250.  (Ex. 17, June 23, 2016 Pre-Mediation Report, Pg. 9, Rockhill001664-73.)  Premier was copied on the June 23, 2016 Pre-Mediation Report. (*Id*. at 10.)

On September 1, 2016, counsel for CSAA wrote to the Rockhill adjuster, raising a new argument that Rockhill is ultimately responsible for reimbursing CSAA for the costs incurred because AAA (a CSAA affiliate) is an additional insured under the Rockhill Policy.  (Ex. 18, Sept. 1, 2016 CSAA Additional Insured Tender, Rockhill000735-36.)  Rockhill responded to CSAA's additional insured tender, informing CSAA that it did not qualify for additional insured

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

5

coverage for the Sakamoto claim because there was no tort claim to defend CSAA against, as would be required for Additional Insured defense under the Rockhill Policy.  (Ex. 19, Oct. 25, 2016 BC Letter, Rockhill000697-701.)

On October 10, 2016, defense counsel sent a pre-trial report, opining that Premier's reasonable exposure was $450,000 to $600,000 and that the settlement value of the case was $600,000 to $800,000.  (Ex. 4, Oct. 2016 Pre-Trial Report, Pgs. 12-13, Rockhill002319-32.)  Premier was copied on the pre-trial report.  (*Id*.)  On October 14, 2016, Rockhill sent CSAA a second Offer to Compromise under California Code of Civil Procedure Sec. 998 in the amount of $450,000.  (Ex. 20, Oct. 14, 2016 Premier 998 Offer, CSAA000283-86.)  CSAA rejected the offer and made no counter-demand.  (Ex. 16, June 7, 2016 Status Report, Pg. 13, Rockhill001678-92.)

On October 18, 2016, Rockhill wrote to Premier and informed it of the amount of remaining limits under the Contractor's Pollution Liability Coverage Part.  (Ex. 21, Oct. 18, 2016 ROR letter, Pg. 2, Rockhill001539-1540.)  On November 1, 2016, Premier demanded that Rockhill pay its remaining limits to CSAA to settle the CSAA Lawsuit.  (Ex. 22, Nov. 1, 2016 Letter from Premier, Rockhill001611.)  <u>Six days later, on November 7, 2016, before trial began, Rockhill did exactly what its insured requested and offered CSAA the remaining applicable limit on its Pollution Liability Policy, which was about $700,000 after defense costs (which erode limits) were subtracted</u>.  (Ex. 5, Nov. 8, 2016 FARA Claims Notes, Rockhill002247.)  CSAA rejected Rockhill's settlement offer of remaining limits.  (*Id*.)  CSAA never made any additional settlement demands or offers to Rockhill or Premier after its $999,999 Offer to Compromise in April 2016.  (Ex. 23, CSAA's Response to Rockhill's Second Set of Request for Admission, Pg. 5, No. 3.)

Trial in the CSAA Lawsuit began on November 7, 2016.  (Ex. 24, CSAA's Response to Rockhill's First Set of Interrogatories, Pg. 9, No. 8.)  Throughout the CSAA Lawsuit, Premier's principal consistently believed that Premier had done nothing wrong during its job at the

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

Sakamotos' house.  (Ex. 8, Depo. of T. Jeter, 38:17-22.)   Throughout the CSAA Lawsuit, Premier thought that CSAA's actions in tearing down the Sakamotos' house and building a new one were unreasonable.  (Ex. 8, Depo. of T. Jeter, 40:24-25, 41:1.)

On January 3, 2017, the Court issued a preliminary Statement of Decision finding in favor of CSAA and proposing judgment of approximately $2.3 million.  (ECF 61 at ¶ 7.)

### D.    The Declaratory Judgment Complaint

On April 17, 2017, Rockhill once again offered its pre-trial remaining limits (as they existed on November 7, 2016) to CSAA in an effort to settle its claim against Premier.  (Ex. 25, April 17, 2017 Letter to CSAA, Rockhill00478-482.)  CSAA rejected this offer and provided no counter-demand.  (Ex. 26, Aug. 18, 2017 Letter to CSAA, Rockhill00001-02.)

On August 18, 2017, Rockhill filed this declaratory judgment action, seeking a ruling that the judgment awarded to CSAA is covered by the Contractor's Pollution Liability Coverage Form of the Rockhill Policy, but not the CGL Coverage Form.  (ECF 14.)  Premier filed a Counterclaim on January 19, 2018, alleging that Rockhill failed to perform its obligations in its policy by failing to indemnify Premier for the adverse verdict and alleging that Rockhill refused to settle CSAA's claim within the applicable limits of the policy.  (ECF 38.)  The underlying final judgment of $2,230,465.53 (comprised of monetary damages and pre-judgment interest totaling $2,003,860.93, plus additional pre-judgment interest from December 1, 2016 to February 1, 2018 in the amount of $226,604.60) was entered on February 1, 2018.  (Ex. 27, Final Judgment in the Underlying Lawsuit, Pg. 2.)

On May 8, 2018, Premier assigned its rights under the Rockhill Policy to CSAA in exchange for CSAA's agreement not to execute on the judgment in the Underlying Lawsuit against Premier. (ECF 62, Exhibit A to CSAA's Counterclaim at ¶ 7.)  <u>Therefore, Premier has no exposure in this matter and it has become a dispute between two insurance companies as to the applicable limit of insurance</u>.  (Ex. 8, Depo. of T. Jeter, 87:4-25, 88:1-6.)

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

7

CSAA filed a Counterclaim on May 18, 2018, alleging that Rockhill breached the implied covenant of good faith, and that CSAA is entitled to the full judgment amount plus attorney's fees and costs. (ECF 62.) On December 11, 2018, CSAA finally agreed to accept Rockhill's remaining limits, which CSAA characterized as a partial satisfaction of the final judgment. (Ex. 28, Dec. 11, 2018 Acknowledgment of Partial Satisfaction of Judgment.)

**E.    CSAA's Lack of Investigation Regarding the Contractor's Pollution Coverage Limits**

CSAA's Direct Repair Network Agreement required vendors who did mold remediation work, like Premier, to obtain one coverage for CGL and a separate coverage for mold remediation. (ECF 14-4 at ¶ 3.3(c).) CSAA's representative handling the Sakamoto claim did not know why the company had this requirement. (Ex. 29, Depo. of R. Sturm, 110:6-15.) CSAA's representative has never heard of a "package policy" with such multiple coverages. (Ex.29, Depo. of R. Sturm, 28:3.) CSAA never saw or analyzed a copy of the Rockhill Policy issued to Premier. (Ex. 29, Depo. of R. Sturm, 58:22-25.) CSAA never asked Rockhill or Premier which coverage part of the policy applied to its claim. (Ex. 24, CSAA's Response to Rockhill's First Set of Interrogatories, Pg. 4, No. 3.) CSAA never asked Rockhill to state the remaining limits of the applicable coverage part because CSAA believed all along that both the CGL and the Contractor's Pollution Liability coverage parts applied. (*Id*.) This was CSAA's position despite the fact that Premier had informed CSAA that it was being defended under the Contractor's Pollution Liability coverage during the underlying case. (Ex. 30, Premier's Responses to CSAA's Form Interrogatories in the Underlying Lawsuit, Pgs. 6-7.) CSAA mistakenly believed that its Section 998 Offer to Compromise in the amount of $999,999 was within the limits of the applicable coverage part. (Ex. 23, CSAA's Answer to Rockhill's Second Set of Requests for Admission, Pg. 4, No. 1.)

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

8

**F.      The Contractors Pollution Liability Coverage As Compared To The CGL Coverage**

Rockhill issued Policy no. ENVP000906-00 to Premier Restoration & Remodel for the policy period February 3, 2013 to February 3, 2014 (the "Rockhill Policy").  (ECF 14 at ¶ 21.) The Rockhill Policy contains two different coverage parts at issue in this lawsuit.  (*Id*.)  First, the Rockhill Policy provides CGL coverage, with a limit of $1 million per occurrence.  (*Id*.) Second, the Rockhill Policy provides Contractor's Pollution Liability coverage, with a limit of $1 million per occurrence, <u>eroded by defense costs</u>.  (*Id*.)  A true and correct copy of the insurance policy was attached to Rockhill's Amended Complaint. (ECF 14-1, Ex. 31, Excerpts of the Rockhill Policy.)  The Rockhill Policy was issued to Premier in Nevada, where Premier resides.  (ECF 28 at ¶¶ 17, 19.)  Rockhill's principle place of business is in Missouri, and the Rockhill Policy was brokered through an Arizona insurance broker, Environmental Underwriting Solutions.  (ECF 14-1 at p. 3.)

The Contractor's Pollution Liability Coverage Form (RHIC 6201 1/11) provides coverage specifically for "property damage" caused by an "occurrence" that results from a "pollution condition" that arises out of "[Premier's] work."  (ECF 14 at ¶ 36.)

In SECTION V – DEFINITIONS the Contractor's Pollution Liability Coverage Form provides, in pertinent part, the following:

> **21.**     "Pollution condition" means the discharge, dispersal, seepage, migration, release or escape of "pollutants".
>
>                    *      *      *
>
> **29.**     "Your work":
>
>          A.     Means:
>
>                    (1) Work or operations performed by you or on your behalf; and
>
>                    (2) Materials, parts or equipment furnished in connection with such work or operations.

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

9

B.   Includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

(2) The providing of or failure to provide warnings or instructions.

(ECF 14 at ¶ 37.)

In addition to this pollution coverage, the Contractor's Pollution Coverage Part also contains a specific endorsement that provides coverage for claims arising from work to prevent the growth of mold.  (ECF 14-1 at p. 64.)

In contrast, the other coverage part Section I – COVERAGES of the CGL Coverage Form (CG 00 01 12/04) includes a Total Pollution Exclusion Endorsement, which precludes coverage for the type of pollution claims that fall under the Contractor's Pollution Coverage. The CGL pollution exclusion states:

This insurance does not apply to:

f. Pollution

(1)  "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

(ECF 14 at ¶ 43.)

In SECTION V – DEFINITIONS the CGL Coverage Form provides, in pertinent part, the following:

*     *     *

**15.**   "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.   Waste includes materials to be recycled, reconditioned or reclaimed.

*     *     *

(ECF 14 at ¶ 41.)

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

10

The Supplemental Policy Exclusions in the CGL Coverage Form includes a Mold Fungus and Organic Pathogen Exclusion, which <u>does not change</u> the pollution and mold coverage available in the Contractor's Pollution Liability Coverage Form.  (ECF 14 at ¶ 48.) The Mold Fungus and Organic Pathogen Exclusion in the CGL coverage part states:

> This insurance does not apply to any:
>
> (1) "Bodily injury," "property damage", "personal and advertising injury" or "claim" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, growth, release or escape of any "organic pathogen" at any time.
>
> (2) Any loss, cost or expense arising out of any:
>
>> (a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain treat, detoxify or neutralize, or in any way respond to, or assess the effects of any "organic pathogen"; or
>
> *   *   *
>
> "Organic pathogen" means any organic irritant or contaminant, including but not limited to mold, fungus, bacteria or virus, including but not limited to their byproduct such as mycotoxin, mildew, or biogenic aerosol."

(ECF 14 at ¶¶ 49, 50.)

## III.   <u>LEGAL STANDARD</u>

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court.  *Northwest Motorcycle Ass'n v. U.S. Dep't of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The moving party is entitled to summary judgment where, viewing the evidence in favor of the opposing party, there are no genuine issues of material fact in dispute and the moving party is entitled to summary judgment as a matter of law.  FRCP 56(a); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact.  *Celotex*

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

11

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon the mere allegations or denials of his pleadings but must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Electrical Service v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987) (party opposing summary judgment may not rely upon allegations of pleadings).  Nor may it rely upon unsupported argument.  *Nolan v. Cleland*, 686 F.2d 806, 812 (9th Cir. 1982) (conclusory argument cannot create a genuine issue of material fact).

The facts as to the allegations of the Underlying Lawsuit and the contents of the Rockhill Policy are not in dispute.  It is not in dispute that the Underlying Lawsuit arose solely from the effects of chemicals used to treat the threat of mold growth, which is specifically excluded under the CGL Coverage Part and specifically covered under the Contractor's Pollution Coverage Part.

It is further undisputed that CSAA never made a settlement demand within the remaining Contractor's Pollution limits, or made any efforts to find out what were the remaining limits.  Moreover, it is undisputed that Rockhill relied on defense counsel's valuations and offered its remaining limits in settlement after defense counsel's valuation so indicated. As further explained below in Section VI, because this case is set for a bench trial, and there are no material facts in dispute, the Court can avoid the time and expense of trial by resolving all of the issues now on summary judgment.

## IV.   CHOICE OF LAW FAVORS NEVADA

Nevada follows the Restatement (Second) of Conflict of Laws (1971) in determining choice-of-law for contract interpretation.  *Starr Indem. & Liab. Co. v. Young*, No. 214CV00239RFBNJK, 2016 WL 4409194 (D. Nev. Aug. 17, 2016).  Under this test, choice of law questions analyze the following factors:

- the place of contracting,
- the place of negotiation of the contract,

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

- the place of performance,

- the location of the subject matter of the contract, and

- the domicile, residence, nationality, place of incorporation and place of business of the parties.

In the instant case, the place of contracting and negotiation of the contract occurred in either Nevada (where Premier is located), Missouri (where Rockhill has its principal place of business), or Arizona (where Premier's broker, Environmental Underwriting Solutions, is located). The contract was issued in Nevada. The place of performance and location of the subject matter of the contract is principally in Nevada where Premier's business premises are located. Regarding the last factor, Premier is a Nevada corporation with its principal place of business in Nevada. Rockhill is an Arizona company with its principal place of business in Missouri. Therefore, Nevada has the most contacts to the Rockhill Policy, and therefore under Nevada choice of law rules, Nevada law will apply to the insurance policy interpretation issues here. The Court previously indicated, during the hearing on Rockhill's Motion for Judgment on the Pleadings, that "It seems clear to the Court that Nevada law applies." (Ex. 32, Transcript of Motion for Judgment on the Pleadings Hearing Jan. 22, 2019, 11:1-2)

CSAA introduced bad faith claims into this case, which are considered torts. *Sgrillo v. Geico Cas. Co.*, 323 F. Supp. 3d 1167, 1170 (D. Nev. 2018). Similar to contract disputes, Nevada courts look to Restatement (Second) of Conflict of Laws §145 (1971) when evaluating choice of law for the tort of bad faith. *Gen. Motors Corp. v. Eighth Judicial Dist. Court of State of Nev. ex rel. Cty. of Clark*, 122 Nev. 466, 473, 134 P.3d 111, 116 (2006). Section 145 lists the following contacts to be taken into consideration when resolving choice of law issues:

1. The place where the injury occurred;

2. The place where the conduct causing the injury occurred;

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**3.**     The domicile, residence, nationality, place of incorporation, and place of business of the parties; and

**4.**     The place where the relationship, if any, between the parties is centered.

*Id*.  The insured, Premier, is located in Nevada.  Furthermore, Premier alleges that it suffered injury as a result of Rockhill's bad faith conduct in Nevada.  CSAA has standing to bring its bad faith claims against Rockhill due solely to Premier's Assignment of Rights.  <u>CSAA was not even a party to the insurance contract at issue, meaning that its own California contacts are irrelevant</u>.  Therefore, the bad faith injury that CSAA asserts in its Counterclaim can also be said to have occurred in Nevada.  It is clear that Nevada law applies to both the contractual and bad faith claims at issue in this case.

V.     <u>COVERAGE APPLIES UNDER THE CONTRACTOR'S POLLUTION PART AND NOT THE CGL COVERAGE PART, WHICH EXCLUDES MOLD AND POLLUTION</u>

A.     **The Contractor's Pollution Liability Coverage Applies To This Claim**

<u>Rockhill has already paid the applicable limit for this matter</u>.  The Contractor's Pollution Coverage Part states that Rockhill will pay for Premier's legal liability for "property damage" caused by an "occurrence" that results from a "pollution condition" that arises out of "[Premier's] work."  The Contractor's Pollution Coverage Part also contains a "Mold Coverage Endorsement" (Form RHIC 6247 (1/11)) which amends the policy to provide coverage for "'property damage' that results from a 'mold pollution condition' that arises out of '[Premier's] work'."  (ECF 14-1 at p. 64.)

The basis of CSAA's claims against Premier in the Underlying Lawsuit is Premier's alleged over-spraying of the anti-fungal chemical Sporicidin, which caused the property to have a lingering odor.  (ECF 61 at ¶¶ 25, 26.).  The only reason to spray Sporicidin at all is to prevent the growth of organic pathogens such as mold.  There is no dispute that the damage to the Sakamoto's property resulted from a "pollution condition" and a "mold pollution condition" that arose from Premier's work.  <u>Thus, this Court should find as a matter of law that the</u>

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

14

<u>Contractor's Pollution Coverage Part applies to the Underlying Lawsuit, and the CGL Coverage</u> <u>Part does not</u>.   On November 30, 2018, Rockhill paid to CSAA its remaining limits under the Contractor's Pollution Coverage Part.   (Ex. 28, Dec. 11, 2018 Acknowledgment of Partial Satisfaction of Judgment.)

**B.     The CGL Coverage Part Does Not Cover This Claim, *As This Court Previously Indicated***

This Court has already indicated that coverage for the Underlying Lawsuit is excluded under the CGL Coverage Part by the Mold Exclusion.   (Ex. 32, Transcript of Motion for Judgment on the Pleadings Hearing Jan. 22, 2019.)   During the January 22, 2019 hearing on Rockhill's Motion for Judgment on the Pleadings, the Court stated the following:

> [I]t is the opinion of the Court that it is undisputed in this action that the underlying lawsuit arose solely from the effects of chemical used to treat the threat of mold growth, which is specifically excluded under the CGL coverage part, and specifically covered under the contractor's Pollution Coverage part. In addition, it appears to the Court that there really is no reasonable debate that the alleged damage to the home in this case would not have occurred in whole or in part, but for -- and again, in my opinion, that's the critical language of the exclusion -- but for the actual or threatened growth of mold.

(*Id*. at 14:8-25, 15:1-2.)

> That being the case, the Court is of the opinion, at this juncture in the case, that at the appropriate point in time, it is likely that judgment will be entered in favor of Rockhill with respect to the second portion, the Commercial General Liability Provision in the policy. And if that's the case, then the limits of liability in this case would be the $1 million, reduced by what the Court would call reasonable defense costs.

(*Id*. at 15:24-25, 16:1-6.)

Since the Court's commentary referenced above, the parties have completed discovery. With no material facts having changed, the time is now ripe for this Court to confirm that the applicable Rockhill coverage is that of the Contractor's Pollution Liability coverage and not the CGL coverage, as discussed below.

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.      **The Mold Exclusion Precludes CGL Coverage for Claims Arising from Work to Prevent the Growth of Mold.**

The CGL Coverage Part of the Rockhill Policy unambiguously excludes any coverage for "'property damage'…or 'claim' which would not have occurred ***in whole or part but for*** the actual…or threatened…growth…of any 'organic pathogen'" at any time.  (ECF 14 at ¶¶ 49, 50.) [emphasis added]  The Mold Exclusion also eliminates coverage for any loss, cost or expense arising out of any request or demand that Premier—or anyone else—clean up, remove, treat, or in any way respond to any "organic pathogen."  "Organic pathogen" is defined to include mold, including byproducts such as mycotoxin or mildew.

Here, it is undisputed that Premier was retained in part to prevent mold growth due to the water leak at the Sakamotos' residence.  (ECF 61 at ¶ 2.)  "As part of the mitigation and repair of the water damage and mold resulting therefrom…Premier applied chemicals, including an anti-fungal agent, brand name Sporicidin…"  (CSAA's underlying complaint, ECF 14-3 ¶ 8.) All parties have admitted that Premier treated the wood framing and other elements of the home with Sporicidin in order to stop the growth and spread of mold spores.  (ECF 61 at ¶ 3.)  There is no other reason to use Sporicidin except to kill and prevent the growth of organic pathogens such as mold.  The basis of CSAA's claims against Premier in the Underlying Lawsuit, is the allegation that Premier over-applied Sporicidin, causing the property to "emit a foul odor" that, according to CSAA, required the residence to be demolished and rebuilt.  (ECF 61 at ¶¶ 25, 26.) Such activities are specifically outside the scope of the CGL Coverage Part due in part to the Mold Exclusion, and instead within the coverage of the Contractors Pollution Coverage Part that Rockhill paid.

There can be no reasonable debate that the alleged damage to the Sakamotos' home would not have occurred, "***in whole or part but for***" the actual or threatened growth of mold. Furthermore, CSAA's alleged expense to demolish and rebuild the home plainly arose out of the Sakamotos' demand that Premier or CSAA clean up, remove, treat, or neutralize mold.  It is only because of the potential growth of mold and the effort to prevent that growth that

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

16

Sporicidin was sprayed in the home.   Consequently, CSAA's Underlying Lawsuit pleads directly into the Mold Exclusion in the CGL coverage part, and directly into the Contractor's Pollution coverage, the remaining limits of which Rockhill has already paid.

In a nearly identical case of alleged Sporicidin over-spraying, the court held that a similar mold exclusion precluded coverage because the over-spraying would not have occurred *but for* the threatened growth of mold.   *Restoration Risk Retention Grp., Inc. v. Selective Way Ins. Co.*, No. A-1975-10T1, 2011 WL 4808211 (N.J. Super. Ct. App. Div. Oct. 12, 2011).   In *Restoration Risk*, homeowners experienced water infiltration into their house and contacted Servpro, a flood restoration company, to devise a plan for mold remediation, which they did. Like Premier's work at the Sakamoto residence, Servpro used Sporicidin to remediate and prevent the growth of mold at the house.   The Sporicidin resulted in a persistent odor, as it allegedly did in the Sakamoto home.   Despite further remediation efforts, the odor remained, and the owners moved and sold their house for a substantial discount of the market value.

The homeowners sued Servpro, which was insured by Restoration Risk under a Contractor's Pollution Liability Policy.   Servpro was also insured by Selective Way Insurance ("Selective") under a CGL Policy for the same policy period.   Restoration Risk's Contractor's Pollution Liability Policy provided substantially similar coverage as the Contractor's Pollution Coverage Part issued by Rockhill to Premier.   Restoration Risk provided a defense to Servpro in the lawsuit under its Contractor's Pollution Liability Policy, just as Rockhill provided a defense here.

At the same time, Restoration Risk filed a declaratory judgment action against Selective, alleging that the Selective CGL policy also applied.   Selective denied coverage on the basis of a "Fungi or Bacteria exclusion," which contained relevant language nearly identical to the Mold, Fungus and Organic Pathogen exclusion in the CGL Coverage Part of the Rockhill Policy.

Restoration Risk, like CSAA, argued that the exclusion did not bar coverage for damages caused by Sporicidin at the residence because it was not the mold that caused the

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

17

damages alleged but, instead, the over-application of Sporicidin that caused an odor.  The court disagreed, reasoning that the "key language [of the exclusion] is that the injury would not have occurred '*but for*' the existence of mold, even if the injuries or damages also had other causes." *Id*. at *4.  [emphasis added]  The court held that the exclusion barred coverage for the odors caused by Sporicidin, stating that "the application of Sporicidin was not an event that was only remotely or tangentially connected to the mold.  It originated in, grew out of, and had a substantial nexus to the mold." *Id*. [emphasis added]  The court went on to say that the "'causal link' and a 'substantial nexus' between the mold and the damages were clear and undisputed" and thus, the ***but for*** connection between mold and the alleged damage was satisfied.  *Id*. at *5.

Exclusions identical to or similar to the Mold Exclusion in the CGL Coverage Part of the Rockhill Policy have been consistently applied by courts in Nevada and nationwide to preclude coverage for remediation damages caused by responding to the threat of mold growth.  *See M&H Enterprises, Inc. v. Westchester Surplus Lines Ins. Co.*, 2010 WL 5387626 (D. Nev. Dec. 20, 2010) (Nevada law) (Fungi exclusion was applied to bar coverage for mold remediation); *Schmitt v. NIC Ins. Co.*, 2007 WL 3232445, at *9 (N.D. Cal. Nov. 1, 2007) (California law) (finding that there was no coverage for mold remediation work pursuant to the Mold exclusion); *Empire Indem. Ins. Co. v. Winsett*, 325 F. App'x 849, 851 (11th Cir. 2009) (reversing the district court and finding the exclusion unambiguously precluded coverage under Florida law); *Pennsylvania Nat. Mut. Cas. Ins. Co. v. Ret. Sys. of Alabama*, 104 F. Supp. 3d 1313, 1320 (N.D. Ala. 2015) (Alabama law) (Fungi or Bacteria exclusion precluded coverage for remediation of condensation, which resulted in the threat of mold growth).

In fact, the Vendor Agreement between Premier and CSAA reflects the fact that both defendants knew that a CGL policy would not provide coverage for mold, and that such coverage instead would reside in the Contractor's Pollution Liability Coverage Part.  Just as was understood in the Vendor Agreement, the Rockhill Policy provides coverage for Premier's liability related to mold remediation under the Contractor's Pollution Liability Coverage Part,

Laxalt & Nomura
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

but plainly excludes coverage for any loss that would not have occurred but for the threat of mold growth under the CGL Coverage Part.  CSAA's and Premier's position is a transparent attempt to re-write the Rockhill Policy in order to create more coverage that the plain language of the policy supports.

### 2.      The Pollution Exclusion Also Precludes Coverage For The Underlying Lawsuit Under the CGL Coverage Part

The CGL Coverage Part of the Rockhill Policy also excludes coverage for "property damage" which would not have occurred but for the discharge or dispersal of "pollutants." "Pollutants" is defined as any irritant or contaminant, including chemicals.

According to its EPA product label, Sporicidin is hazardous to humans and causes eye irritation.  (ECF 64, Ex. 1, U.S. EPA Pesticide Product Label.)[1]  Sporicidin contains phenol, which has been found to be a "pollutant" as defined in the pollution exclusion.  *Certain Underwriters at Lloyd's London v. C.A. Turner Const. Co.*, 112 F.3d 184, 188 (5th Cir. 1997) (Texas law) (the pollution exclusion barred coverage for injuries sustained as a result of the release of phenol gas into a confined tent).

CSAA alleged that it was required to demolish the Sakamoto's home because of a persistent odor due to over-spraying Sporicidin.  <u>Thus, there can be no dispute that the alleged "property damage" would not have occurred but for the discharge or dispersal of a pollutant, and therefore, the Underlying Lawsuit is excluded from coverage under the CGL Coverage Part</u>.

Rockhill anticipates that CSAA will argue that Nevada law limits the application of the Pollution Exclusion to traditional harm to the environment as opposed to a foul odor in a home.  *See Century Sur. Co. v. Casino W., Inc.*, 329 P.3d 614 (Nev. 2014).  In *Century*, the court held that the pollution exclusion could be interpreted as applying to either any type of pollution damage or limited to environmental pollution, and because of this perceived ambiguity, the

---

[1] <u>Musgrave v. ICC/Marie Callender's Gourmet Prod. Div.</u>, No. 14-CV-02006-JST, 2015 WL 510919, at *3 (N.D. Cal. Feb. 5, 2015) (California law) (documents available through government agency websites are often considered appropriate for judicial notice as documents in the public record not reasonably subject to dispute).

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

exclusion has to be given its narrowest reading.  In *Century*, there was no separate pollution coverage as there is here, so the analysis of where the policy's pollution coverage may be found is completely different than in this case.

As discussed above, the Vendor Agreement between CSAA and Premier demonstrates that the parties knew that Premier's CGL Coverage Part would not apply to pollution, and therefore required Premier to obtain separate pollution coverage, which it did under the Contractor's Pollution Liability Coverage Part of the Rockhill Policy.  Consequently, this Court should grant summary judgment in Rockhill's favor on its Amended Complaint and find that the CGL Coverage Part does not apply to the Underlying Lawsuit.

## VI.   EACH OF CSAA'S BAD FAITH THEORIES CAN BE DECIDED AS A MATTER OF LAW TO FIND THAT ROCKHILL IS NOT LIABLE FOR COMMON LAW BAD FAITH

CSAA's and Premier's Counterclaims allege that Rockhill breached the covenant of good faith and fair dealing.  (ECF 62, ECF 38)  Specifically, it is CSAA's position that, even if the Court determines that only the Contractor's Pollution Liability Coverage Part applies, Rockhill is still in bad faith because of the following three issues:

1. Coverage Dispute: CSAA believes that Rockhill unreasonably denied coverage to Premier under the CGL Coverage

2. Failure to Settle: CSAA believes that Rockhill unreasonably ignored the opportunity to settle the case within its policy limits of the CGL Coverage when it received the settlement offer of $999,999 from CSAA

3. Misaligned Liability Analysis: CSAA believes that Rockhill unreasonably and without proper cause failed to recognize a clear liability case where it contended it only had coverage under a self-consuming policy.[2]

(ECF 62 at ¶ 23.)

Laxalt & Nomura
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

---

[2] CSAA's Counterclaim contains additional allegations of bad faith.  However, upon examination, they merely reword the three allegations stated above, and do not provide distinctive claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**A.      Rockhill's Decision to Deny Coverage Under the CGL Coverage is a Pure Legal Question and Does Not Create Bad Faith**

The determination of which coverage part applies to CSAA's claim is a legal issue of insurance contract interpretation, which can be decided as a matter of law.  *Fed. Ins. Co. v. Coast Converters*, 339 P.3d 1281, 1288 (Nev. 2014) (concluding that because contract interpretation is a question of law, the district court should have decided, as a matter of law, which policy provision applied to an insured's loss).  The facts as to the allegations of the Underlying Lawsuit and the contents of the Rockhill Policy are not in dispute.  It is also not in dispute that the Underlying Lawsuit arose solely from the effects of chemicals used to treat the threat of mold growth, which is specifically excluded under the CGL Coverage Part and specifically covered under the Contractor's Pollution Liability Coverage Part.  Therefore, this Court should formally confirm its preliminary position that the Contractor's Pollution Liability Coverage Part is the only coverage part that applies to CSAA's claim.

Moreover, because the key to a bad faith claim is whether denial of a claim was reasonable, a bad faith claim should be dismissed on summary judgment if the defendant demonstrates that there was "a genuine dispute as to coverage," as there is here.  *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 669 (9th Cir. 2003) (California law); *Siefers v. PacifiCare Life Assur. Co.*, 729 F. Supp. 2d 1229, 1236 (D. Nev. 2010), *aff'd,* 461 F. App'x 652 (9th Cir. 2011) (Nevada law).  A reasonable, or good faith, dispute over an open question of law affecting insurance coverage cannot  constitute  an  insurance bad faith claim  as  a  matter  of  law.  *Brewington v. State Farm Mut. Auto. Ins. Co.*, 96 F. Supp. 3d 1105, 1109 (D. Nev. 2015) (Nevada law).  In sum, if there is a genuine dispute over whether or not the CGL Coverage Part applies to CSAA's claim, then Rockhill's position with respect to this dispute cannot be in bad faith.  Here, not only was there a genuine dispute, but as previously discussed, as a matter of law, Rockhill was correct and justified in its coverage position.

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

## B.    Bad Faith Failure to Settle Can Be Determined As a Matter of Law

There are two reasons why CSAA's bad faith failure to settle allegations can be determined as a matter of law.  First, if there is no demand within limits, then there can be no bad faith as a matter law.  *Dorroh v. Deerbrook Ins. Co.*, 223 F. Supp. 3d 1081, 1091 (E.D. Cal. 2016), aff'd, 751 F. App'x 980 (9th Cir. 2018) (California law) (an insurer does not breach the implied covenant if it never had the opportunity to settle because there was not a reasonable settlement offer made within the policy limits); *Graciano v. Mercury Gen. Corp.*, 231 Cal. App. 4th 414, 425, 179 Cal. Rptr. 3d 717, 726 (2014), *as modified on denial of reh'g* (Nov. 12, 2014) (as a matter of law, a claim for bad faith based on an alleged wrongful refusal to settle first requires proof the third party made a reasonable offer to settle the claims against the insured for an amount within the policy limits.)  When CSAA made its Sec. 998 demand in the amount of $999,999, Rockhill had been defending Premier under the eroding limits Contractor's Pollution Liability Coverage Part for ten months.  (Ex. 3, June 2, 2015 ROR, Rockhill001526-1527.)  Because the Contractor's Pollution Liability Coverage Part contains a $1 million limit before erosion, this limit had been reduced to lower than $999,999 by the time Rockhill received CSAA's Sec. 998 demand.  (Ex. 33, CSAA's Request for Production of Documents, Second Set, Exhibit A)  Therefore, there was never a demand within limits, and, as a matter of law, Rockhill cannot be found to have acted in bad faith by rejecting CSAA's demand.

Second, as a matter of law, an insurer cannot be found to be liable for bad faith when it reasonably relies on the advice of counsel.  *State Farm Mut. Auto. Ins. Co. v. Super. Ct.,* 228 Cal.App.3d 721, 279 Cal.Rptr. 116 (1991) (advice of counsel serves as a defense against allegations of bad faith where an insurer reasonably relied on such advice, even if ultimately the attorney's judgment was mistaken); *T.G.S. Transp., Inc. v. Canal Ins. Co.*, 216 F. App'x 708 (9th Cir. 2007) (California law) (granting summary judgment in insurer's favor, and finding that an insurer's good faith reliance on the advice of counsel negates allegations of bad faith);

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

22

*Spargo v. State Farm Fire & Cas. Co.*, No. 216CV03036APGGWF, 2017 WL 2695292, at *4 (D. Nev. June 22, 2017).

Here, defense counsel did not believe that it was reasonable for CSAA to have demolished and rebuilt the Sakamotos' house due to an odor.  (Ex. 34, Depo. of L. Fink, 32:9-25; 33:1.)  At the time CSAA made its Sec. 998 demand in the amount of $999,999, defense counsel believed that Premier's conduct at the Sakamotos' house did not breach the standard of care.  (Ex. 1, April 26, 2016 Status Report, Pg. 8, Rockhill001697-1716.)  Defense counsel did not believe that Premier's conduct was adverse to industry customs and practices.  (*Id.*)  Instead, defense counsel believed that there was a 75-80% chance of a defense verdict in the case.  (Ex. 14, May 3, 2016 FARA Claims Notes, Rockhill001885.)

Rockhill reasonably relied on the advice of counsel to evaluate liability and damages in the case.  This is evident in the Claims Notes where Rockhill's settlement offers followed defense counsels' recommendations lockstep.  (Ex. 14, May 3, 2016 FARA Claims Notes, Rockhill001884-85; Ex. 4, Oct. 10, 2016 Pre-Trial Report, Rockhill002319-2332; Ex. 20, Oct. 14, 2016 Premier 998 Offer, CSAA000283-86; Ex. 5, Nov. 8, 2016 FARA Claims Notes, Rockhill002247.)  The only time that Rockhill deviated from defense counsel's valuations and recommendations was when it decided to offer $101,000 to CSAA in response to its Sec. 998 demand.  This was more than double what defense counsel had recommended.  (Ex. 14, May 3, 2016 FARA Claims Notes, Rockhill001884-85.)

| Defense Counsel Valuation | | Rockhill Settlement Offer | |
|---|---|---|---|
| Date | Amount | Date | Amount |
| May 3, 2016 | $40,000 | May 9, 2016 | $101,000 |
| October 10, 2016 | $450,000-$600,000 | October 14, 2016 | $450,000 |
| November 3, 2016 | $700,000 | November 7, 2016 | $700,000 |

Liability was not clear from defense counsel's perspective, and Rockhill acted reasonably in following defense counsel's recommendation to reject CSAA's Sec. 998 demand.  CSAA has

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

23

not pointed to any facts to establish that defense counsel inappropriately valued the case. Because Rockhill diligently relied on the advice of counsel, as a matter of law, it cannot be found liable for bad faith.

C.     **As a Matter of Law, Disagreements Over Liability Do Not Create Bad Faith**

CSAA believes that Rockhill acted in bad faith because it failed to succumb to CSAA's view of liability.   This Court can and has ruled on bad faith claims involving liability disagreements as a matter of law.  *Hicks v. Dairyland Ins. Co.*, No. 2:08-CV-1687-RCJPAL, 2010 WL 2541175, at *8 (D. Nev. Mar. 3, 2010), *aff'd,* 441 F. App'x 463 (9th Cir. 2011) (Nevada law) (finding an insurer acted reasonably when it rejected a demand for policy limits that was sent before the full extent of injuries was known, and was not liable for bad faith as a matter of law); *Brewington v. State Farm Mut. Auto. Ins. Co.*, 96 F. Supp. 3d 1105 (D. Nev. 2015) (granting summary judgment as a matter of law where the insurer reasonably denied coverage on an issue of first impression in Nevada); *Pioneer Chlor Alkali Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 863 F. Supp. 1237, 1247 (D. Nev. 1994) (insurer's reasonable denial of claim precluded bad faith claim a matter of law).

**In fact, CSAA itself has successfully argued in this Court that disagreements over liability cannot establish bad faith as a matter of law**.  *AAA Nevada Ins. Co. v. Vinh Chau*, 808 F. Supp. 2d 1282, 1287 (D. Nev. 2010), aff'd in part, dismissed in part sub nom. *AAA Nevada Ins. Co. v. Chau*, 463 F. App'x 627 (9th Cir. 2011) (holding, as a matter of law, that Plaintiff's actions did not amount to bad faith because it acted reasonably in denying an unreasonable settlement demand that expired before the insurer concluded its investigation of the claim); *Amini v. CSAA Gen. Ins. Co.*, No. 2:15-CV-0402-JAD-GWF, 2016 WL 6573949, at *4 (D. Nev. Nov. 4, 2016) (granting summary judgment on bad faith claim because CSAA showed that it had a reasonable basis for disputing the value of the insurance claim, rejecting a policy-limit demand, and offering a lower amount to settle the case).

Laxalt & Nomura
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Laxalt & Nomura
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

    The Nevada Supreme Court has defined bad faith as "an actual or implied awareness of
the absence of a reasonable basis for denying benefits of the [insurance] policy."  *Allstate Ins.
Co. v. Miller*, 125 Nev. 300, 308, 212 P.3d 318, 324 (2009).  To establish a prima facie case of
bad faith refusal to pay an insurance claim, the plaintiff must establish that the insurer had no
reasonable basis for disputing coverage, and that the insurer knew or recklessly disregarded the
fact that there was no reasonable basis for disputing coverage.  *Powers v. United Servs. Auto.
Ass'n*, 114 Nev. 690, 730, 962 P.2d 596, 621 (1998), *opinion modified on denial of reh'g*, 115
Nev. 38, 979 P.2d 1286 (1999).  "Stated another way, an insurance company is not liable for
bad faith if it had a reasonable basis for denying a claim."  *Hicks* at *8.  The undisputed facts in
this case show, as a matter of law, that Rockhill acted reasonably in handling CSAA's claim
against Premier, and did not act in bad faith.

    CSAA believes that Rockhill is in bad faith because it "unreasonably...refused to
attempt to reach a prompt settlement of a clear liability case."  (ECF 62 at ¶ 23.)  However,
CSAA is unable to show that Rockhill acted unreasonably in its liability analysis.  The alleged
odor at the Sakamotos' house was below the level known to be detectable by the human nose.
(Ex. 2, Environmental Testing & Consulting Report, Pg. 6, Rockhill001347-76.)  Furthermore,
CSAA failed to follow the recommendations of its environmental consultant to remediate the
odor by venting the house for two months and spraying the wood with an encapsulate paint.
(Ex. 4, Oct.10, 2016 Pre-Trial Report, Pg. 9, Rockhill002327.)  Rockhill's own environmental
expert believed that, had CSAA covered the wood framing with drywall, it would have rendered
the odor undetectable, especially given the extremely low levels of phenol.  (*Id.*)

    Rockhill's insured, Premier, did not agree that it was a "clear liability case."  Premier
believed that it did a good job in its mold prevention efforts at the Sakamotos' house.  (Ex. 8,
Depo. of T. Jeter, 40:7-10.)  Premier did not believe that it did anything wrong in its mold
remediation and prevention efforts.  (Ex. 8, Depo. of T. Jeter, 38:17-19.)  Premier did not
believe that it acted negligently at the Sakamotos' house.  (Ex. 8, Depo. of T. Jeter, 38:20-22.)

25

Premier believed that CSAA's demolition and rebuild of the Sakamotos' house was unreasonable. (Ex. 8, Depo. of T. Jeter, 40:24-25; 41:1.) Premier was "very shocked" to hear that CSAA decided to demolish the Sakamotos' house and build a new one. (Ex. 8, Depo. of T. Jeter, 40:21-23.) Out of thousands of remediation jobs that it has completed, Premier has never heard of a homeowners' insurer tearing down and rebuilding a house to effectuate a "guarantee satisfaction." (Ex. 8, Depo. of T. Jeter, 42:16-25; 43:1-4.)

CSAA alleges that Rockhill's Sec. 998 settlement offer of $101,000, in response to its $999,999 demand, was unreasonable because "it amounted to less than 5% of CSAA's loss to that date in a case of clear liability where CSAA had already paid out more than $2,000,000 in monetary payments." (ECF 62 at ¶ 11.) CSAA is conflating the costs of its own "guarantee satisfaction" promise with the question of Premier's liability exposure. Simply because CSAA offered to build a brand new, larger house to the tune of $3 million to maintain its "guarantee satisfaction" provision in the policy issued to its insureds, does not mean that Premier has automatic liability, as defense counsel repeatedly explained.

CSAA believes that Rockhill should have sent an insurance representative in person to a mediation between the parties on July 18, 2016, and offers this fact as additional support for its bad faith claim. (ECF 62 at ¶ 12.) However, CSAA does not issue third-party property and casualty insurance policies like the Rockhill Policy, and has no experience in mediating claims under those policies. (Ex. 29, Depo. of R. Sturm, 32:19-25, 33: 1-14.) In fact, it was reasonable for Rockhill to send defense counsel with authority to the mediation instead of an insurance representative because it is common practice for third party insurers to send defense counsel to mediation without an insurance representative. (Ex. 34, Depo. of L. Fink, 26:16-25, 27:1-6.) Furthermore, defense counsel was in contact with the Rockhill insurance representative multiple times during the mediation, and the mediation was ultimately unsuccessful because CSAA rejected a conditional offer by Rockhill, not because Rockhill did not have authority to accept a

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

demand by CSAA.  (Ex. 35, July 16, 2016 FARA Claims Notes, Rockhill001816-17; Ex. 6, July 25, 2016 Post-Mediation Report, Pgs. 3-4, Rockhill002516.)

Between the time CSAA made its Sec. 998 demand (April 4, 2016) and November 1, 2016, Premier never requested in writing that Rockhill or defense counsel accept CSAA's $999,999 demand.  (Ex. 8, Depo. of T. Jeter, 48:6-9.)  Between May 9, 2016 and November 1, 2016, Premier did not advise Rockhill or defense counsel in writing that it disagreed with the amount of Premier's $101,000 settlement offer.  (Ex. 8, Depo. of T. Jeter, 57:21-23.)  Before November 1, 2016, Premier never specifically demanded that Rockhill settle the CSAA Lawsuit.  (Ex. 8, Depo. of T. Jeter, 68:16-19, 69:1-4.)

In advance of trial, six days after Premier demanded for the first time that Rockhill offer its remaining limits to try to settle the case, and after defense counsel increased its settlement value of the case to $600,000-$800,000, Rockhill offered its remaining limits to CSAA.  (Ex. 4, Oct. 10, 2016 Pre-Trial Report, Pg. 13, Rockhill002319-2332; Ex. 5, Nov. 8, 2016 FARA Claims Notes, Rockhill002247.)

CSAA rejected Rockhill's pre-trial offer of its $700,000 in remaining limits because CSAA "had been forced to spend in excess of $100,000 in preparing for trial."  (ECF 62 at ¶ 20.)  However, the fact that CSAA spent money litigating its own subrogation claim has no bearing on the reasonableness of Rockhill's analysis of the insurance and liability exposure at issue.

CSAA asserts in retrospect that it would have entertained a settlement offer from Rockhill that was lower than $999,999 if Rockhill had informed CSAA that it was defending Premier under an eroding limits policy.  However, there is no evidence in the record that CSAA informed Rockhill that it was willing to settle for less than $999,999, and mere argument without any evidence cannot be relied upon to support a claim for bad faith.  CSAA's position is also contradictory to the evidence in the case, which shows that CSAA believed all along and still believes to this day – despite the Court's admonitions regarding the applicability of the

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

27

Mold Exclusion – that the CGL coverage applies to its claim.  Even if Rockhill had offered the remaining limits of the Contractor's Pollution Liability Coverage earlier in the case, CSAA would have insisted that the $1 million limit of the CGL Coverage applied and would have rejected any settlement offer for an amount less than its $999,999 demand.

Finally, CSAA's bad faith allegations against Rockhill are merely an attempt to deflect or distract from CSAA's own misunderstandings of coverage and transform them into a bad faith claim.  CSAA never even inquired into the remaining limits of the Rockhill Policy.  (Ex. 24, CSAA's Answer to Rockhill's First Set of Interrogatories, No. 3.)  CSAA mistakenly believed that its Sec. 998 demand was within the policy limits.  (Ex. 23, CSAA's Answer to Rockhill's Second Set of Requests for Admission, Pg. 4, No. 1.)  CSAA confused additional insured coverage with first party coverage.  (Ex. 18, Sept. 1, 2016 CSAA Additional Insured Tender, Rockhill000735-36, CSAA's Response to Rockhill's First Set of Interrogatories No. 5.) CSAA believed that both the CGL and Contractor's Pollution Liability Coverage Parts applied to its claim.  (ECF 61 at ¶ 29.)

Through these misunderstandings, CSAA believed that $1 million should apply to its claim, and CSAA built a litigation position based on a) obtaining this amount or b) litigating bad faith.  This view was too binary, and never accounted for the legal reality that the eroding Contractor's Pollution Liability limit applied to its claim.  CSAA cannot retroactively try to create bad faith in an effort to distract from its own inaccurate misunderstanding of the coverage available for its claim.

## VII.   CONCLUSION

WHEREFORE, Rockhill requests that this Court enter an order as follows:

1.  Ruling that the Contractor's Pollution Liability Coverage Part applies to CSAA's claim, which the parties do not dispute, and the remaining limits of which Rockhill has already paid to CSAA;

2.  Ruling that the Mold Exclusion precludes coverage under the CGL Coverage Part, and granting judgment in favor of Rockhill on its Amended Complaint (ECF 14 Count II);

Laxalt & Nomura.
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno. Nevada

28

**3.** Ruling that, to the extent that judgment is entered in Rockhill's favor on Count II of its Amended Complaint, Count I of Rockhill's Amended Complaint is rendered moot, as is Count III of Rockhill's Amended Complaint regarding whether the limits of the Contractor's Pollution Liability and CGL Coverage Parts can be stacked;

**4.** Granting judgment in favor of Rockhill and against CSAA on CSAA's Counterclaim (ECF 62);

**5.** Granting judgment in favor of Rockhill and against Premier on Premier's Counterclaim (ECF 38);

**6.** Granting Rockhill any such other relief as is necessary and just.

DATED this 6th day of June, 2019.

Respectfully submitted,

/s/ *Adam H. Fleischer*

Adam H. Fleischer (Illinois Bar No. 6224928)
    (admitted *pro hac vice*)
John A. Husmann (Illinois Bar No. 6273392)
    (admitted *pro hac vice*)
Joanna G. Swartout (Illinois Bar No. 6305993)
    (admitted *pro hac vice*)
BATESCAREY LLP
191 North Wacker, Suite 2400
Chicago, Illinois 60606
Telephone: (312) 762-3100
Facsimile:  (312) 762-3200
afleischer@batescarey.com
jhusmann@batescarey.com
jswartout@batescarey.com

*and*

Daniel T. Hayward (SBN 5986)
LAXALT & NOMURA, LTD.
9790 Gateway Drive, Suite 200
Reno, Nevada 89521
Telephone:  (775) 322-1170
Facsimile:  (775) 322-1865
dhayward@laxalt-nomura.com

*Attorneys for Plaintiff,*
*Rockhill Insurance Company*

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada

2212149

29

1

## CERTIFICATE OF SERVICE

2

Pursuant to FRCP 5(b), I hereby certify that I am an employee of LAXALT &

3

NOMURA, LTD., and that on the 6th day of June, 2019, I caused to be served a true and correct

4

copy of the foregoing document by:

5

6

☐    Mail on the parties listed below in said action, by placing a true copy thereof enclosed in a sealed envelope in a designated area for outgoing mail, addressed as set forth below. At the Law Offices of Laxalt & Nomura, mail placed in that designated area is given the correct amount of postage and is deposited that same date in the ordinary course of business, in a United States mailbox in the City of Reno, County of Washoe, Nevada.

7

8

9

☐    Facsimile on the parties in said action by causing a true copy thereof to be telecopied to the number indicated after the address(es) noted below.

10

11

☒    By Electronic service by filing the foregoing with the Clerk of Court using the –E Service on line filing system, which will electronically mail the filing to the following individuals at the email addresses registered for this case.

12

13

addressed as follows:

14

15

Scott A. Glogovac
GLOGOVAC LAW LLC
3975 San Donato Loop
Reno, Nevada 89519
scottglogovac2019@outlook.com

16

17

18

Frederick H. Ebey
The Grunsky Law Firm PC
240 Westgate Drive
Watsonville, California 95076
rewall@grunskylaw.com
fhebey@grunskylaw.com
mshaw@grunskylaw.com
*Attorneys for CSAA Insurance Exchange*

19

20

21

22

23

Lisa A. Taylor
Law Office of Lisa A. Taylor
5664 N. Rainbow Blvd.
Las Vegas, Nevada 89130
lisa@ltaylorlaw.com
*Attorney for Premier Restoration and Remodel, Inc.*

24

25

26

27

_____
KATHIE MARTIN

28

Laxalt & Nomura,
Attorneys at Law
9790 Gateway
Drive
Suite 200
Reno, Nevada